UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :   : 3:CR-16-152

VS.                        :        (Judge Munley)

JOSIAH FERREBEE,
                    Defendant         :

**<u>SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S</u>
<u>MOTION TO SUPPRESS STATEMENTS</u>
<u>AND PHYSICAL EVIDENCE</u>**

The government previously filed a brief in this matter prior to the

suppression hearing. On December 15, 2017, testimony and exhibits

were presented at the suppression hearing, after which the Court

directed the parties to file supplemental briefs.

On June 2, 2016, HSI Special Agents executed a search warrant at

a residence in Schuylkill County, Pennsylvania, in connection with a

child pornography investigation. (N.T. Suppression Hearing, pp. 3-4).

The residence belonged to a family named Suda, and the defendant's

mother, Kathy DeAngelo, babysat at the residence for about 2 ½ years

prior to the date of the search. (N.T. Suppression Hearing, pp. 118-119).

When Kathy DeAngelo babysat at the residence, her son, the defendant,

1

was present at times and had access to the internet via his cell phone. (N.T. Suppression Hearing, p.118).

The defendant was not present in the Suda residence at the time of the search, and agents learned that he was employed at the Twin Grove Campground. (N.T. Suppression Hearing, p. 6). Agents located the defendant's residence, which was a short distance from the campground where he worked. (N.T. Suppression Hearing, pp. 4, 7). Agents traveled to the campground, met with the defendant's mother and asked her to contact the defendant, which she did. (N.T. Suppression Hearing, p. 11, 30, 113).

The defendant Josiah Ferrebee arrived at the campground on his bike and met with his mother and agents inside the convenient store on the campground property. (N.T. Suppression Hearing, pp. 11-12, 113). The defendant had worked at the campground since June 2015. (N.T. Suppression Hearing, p. 119). Due to the nature of the investigation,

agents suggested that they move from the center of the convenience store to a large room called the camp lounge. (N.T. Suppression Hearing, pp. 11-12, 32). The defendant and his mother agreed to go to the camp lounge. Government's Exhibits 1E and 1F depict the size and physical layout of the room, including an L-shaped couch. (N.T. Suppression Hearing, p. 10-11). The room was entered and exited via a large archway. The interview took place with the defendant (and initially his mother) seated on one portion of the L-shaped couch, and two HSI agents seated at the other portion of the L-shaped couch across a table. (N.T. Suppression Hearing, pp. 12-13, 37). There were no physical barriers preventing the defendant from leaving the room at any time. (N.T. Suppression Hearing, pp. 11, 27,115). There were no physical restraints on the defendant's movement. (N.T. Suppression Hearing, p. 17). The agents never told the defendant that he could not leave the room. (N.T. Suppression Hearing, p. 115). The agents did not speak to the defendant in a hostile or threatening tone of voice, and the defendant was cooperative throughout the 45-50 minute interview. (N.T. Suppression Hearing, pp. 16-17, 118). The defendant's answers

were responsive to the questions asked by the agents. The defendant was coherent and alert throughout the interview. (N.T. Suppression Hearing, p.121).

HSI Special Agent Richard Cerminaro testified that prior to asking any substantive questions about the investigation, the defendant was informed that he was not under arrest and could leave the room at any time. (N.T. Suppression Hearing, pp. 13, 33-34).[1] The defendant agreed to talk to the agents, and subsequently implicated himself in the crimes under investigation. (N.T. Suppression Hearing, pp. 13, 17). There were several breaks taken during the interview, and there was a time during the interview when the defendant was left alone on the couch. (N.T. Suppression Hearing, p. 16). At no time during the interview did the defendant request to leave the room or end the interview. (N.T. Suppression Hearing, pp. 16, 17). At one point during

---

[1] Although the defendant's mother testified that the agent's did not inform the defendant in her presence that he was not under arrest and was free to leave, she admitted that she was only in the interview room for perhaps ten minutes with the defendant and the agents before she left the room. (N.T. Suppression Hearing, p. 116).

the interview, the defendant was asked if he would consent to the search of his I-phone, and he consented. The defendant was presented with a consent form, which was summarized to him by Agent Kathryn Murray, and he read the form and signed it. The defendant's signature was witnessed by Agent Murray and two other HSI agents. (N.T. Suppression Hearing, pp. 17-19, 60-61). The signed written consent to search form was admitted into evidence as Exhibit 1. (N.T. Suppression Hearing, p.19).

During the interview, HSI agents did not display their firearms (both agents' firearms were concealed under their shirts/jackets). (N.T. Suppression Hearing, pp. 13, 17, 119).[2]

After the interview, agents offered the defendant the opportunity to take a polygraph examination. (N.T. Suppression Hearing, p. 20). HSI Agent Thad Baxter met with the defendant to explain the process and determine if Ferrebee was willing to take a polygraph. Agent Baxter told the defendant that it was completely voluntary. (N.T. Suppression

---

[2] The defendant's mother, during the very brief time she was with the defendant and the agents in the room, did not observe the agents' firearms. (N.T. Suppression Hearing, p. 119).

Hearing, pp. 70, 97). Ferrebee agreed to take a polygraph. (N.T. Suppression Hearing, pp. 69-70). Ferrebee was never told by agents that he had to take a polygraph. (N.T. Suppression Hearing, p. 22).

Agents provided directions to the state police barracks at Jonestown and suggested that they meet at the barracks later that afternoon. Agents suggested to the defendant that he get a bite to eat before coming to the barracks for the polygraph. (N.T. Suppression Hearing, p. 21, 22, 122). The defendant exited the camp lounge and the building on his own at about 12 noon or so. (N.T. Suppression Hearing, p. 21). He later informed agents that he had chicken nuggets for lunch before arriving at the barracks for the polygraph. (N.T. Suppression Hearing, p. 122).

Sometime later that afternoon at about 1:40pm, the defendant arrived at the state police barracks for the polygraph. (N.T. Suppression Hearing, p. 71). The defendant was not escorted by agents to the barracks; he came their by himself. (N.T. Suppression Hearing, p. 71). After he arrived at the barracks, Agent Baxter briefly patted him down for security reasons and escorted the defendant to the room where the

polygraph equipment was placed. (N.T. Suppression Hearing, p. 71).

Once inside the room with Agent Baxter, who was unarmed, the defendant was advised verbally and in writing of his Miranda rights and presented with a waiver of rights form. (N.T. Suppression Hearing, pp. 72). Agent Baxter read each line of the form to the defendant and initialed each line after the defendant said he understood the rights explained in each line of the form. (N.T. Suppression Hearing, pp. 73-74). The signed Statement of Rights Form was admitted as Exhibit 2. (N.T. Suppression Hearing, p. 74).

Next, the defendant read and signed a consent form to take the polygraph. Once again, Agent Baxter read the defendant each line on the form and initialed each line after the defendant acknowledged understanding each line of the form. (N.T. Suppression Hearing, pp. 74-75). The signed consent to polygraph form was admitted as Exhibit 3. (N.T. Suppression Hearing, p. 75).

After the defendant verbally and in writing waived his Miranda rights and consented to the polygraph, Agent Baxter reviewed a biographical and medical form with Ferrebee. (N.T. Suppression

Hearing, p. 76). Agent Baxter next asked him questions pertaining to the investigation. (N.T. Suppression Hearing, p. 77). This included reviewing with Ferrebee the chat logs of his conversations with the minor victim in the case. Agent Baxter asked Ferrebee to review each chat and initial the bottom of the page if the chats were accurate and involved Ferrebee and the minor victim. (N.T. Suppression Hearing, p. 77-78). Ferrebee did so—signing the front page of the chats and placing his initials at the bottom of each page of the chats. (N.T. Suppression Hearing, p. 78). The signed and initialed chat logs were admitted as Exhibit 4. (N.T. Suppression Hearing, p. 78).

During Agent Baxter's interaction with the defendant, Agent Murray was in another room audio-monitoring the interaction. (N.T. Suppression Hearing, p. 84). After the polygraph was completed, Agent Murray came into the room. The defendant subsequently was asked if he would consent to the search of thumb drives and consent to allowing agents to assume his online identity, and he agreed to do so. (N.T. Suppression Hearing, pp. 80-82). The defendant read and signed forms consenting to both in the presence of Agents Baxter and Murray, and

those signed forms were admitted as Exhibits 5 and 6. After the defendant had implicated himself in the crimes under investigation, he told Agent Baxter that it felt as if rocks had been lifted off his shoulders. (N.T. Suppression Hearing, p. 83). At no time during the approximately four hours that the defendant was at the state police barracks did he ask to leave. He did not appear to be suffering from any ailments. He was afforded bathroom breaks when requested. (N.T. Suppression Hearing, p. 82, 87). Agent Baxter's questioning was neither hostile nor threatening, and the defendant was cooperative throughout the process. (N.T. Suppression Hearing, p. 82).

The defendant subsequently exited the barracks on his own and left the area. (N.T. Suppression Hearing, p. 83).

## 1.    The Defendant Was Not in Custody During the Campground Interview

The Third Circuit Court has explained the legal principles that apply in determining whether a person was in police custody and thereby entitled to receive *Miranda* warnings prior to being interrogated:

> A person is in custody when he either is arrested formally or his freedom of movement is restricted to "the degree associated with a formal arrest." *Id.* at 743 (citation and internal quotation marks omitted). For a person to be in custody when he has not been arrested, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Steigler v. Anderson,* 496 F.2d 793, 799 (3d Cir.1974) (quoting *United States v. Hall,* 421 F.2d 540, 545 (2d Cir.1969)). Thus, "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). *Miranda,* of course, requires warnings only when the person the police are questioning is in custody. *Miranda v. Arizona,* 384 U.S. 436, 468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

*United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006);

*United States v. McNeil*, 416 Fed. Appx. 227, 228-29 (3d Cir. 2011) (not

precedential). Furthermore, it is the objective circumstances of the

interview, not the subjective views of the police or the person

interviewed, that govern the determination of custody in a given case.

*Stansbury v. California*, 511 U.S. 318, 323 (1994); *United States v.*

*McKinney*, 695 F.Supp. 2d 182, 188-89 (E.D. Pa. 2010). The question is

whether a reasonable person in the suspect's situation would feel free to

end the questioning and leave. *United States v. Jacobs*, 431 F.3d 99,

105 (3d Cir. 2005); *United States v. Morgan*, 562 Fed. Appx. 123, 129-30

(3d Cir. 2014). To answer that question, the Third Circuit looks at the

following factors:

> (1)whether the officers told the suspect he was under
> arrest or free to leave; (2) the location or physical
> surroundings of the interrogation; (3) the length of the
> interrogation; (4) whether the officers used coercive tactics
> such as hostile tones of voice, the display of weapons, or
> physical restraint of the suspect's movement; and (5)
> whether the suspect voluntarily submitted to questioning.
> *See United States v. Czichray,* 378 F.3d 822, 827 (8th
> Cir.2004); *United States v. Hayden,* 260 F.3d 1062, 1066
> (9th Cir.2001); *United States v. Crossley,* 224 F.3d 847, 861
> (6th Cir.2000).

*United States v. Willaman*, 437 F.3d at 359–60; *United States v.*

*McNeil*, 416 Fed. Appx. at 228-29.

Here, after agents met with Ferrebee at the campground, they

expressly informed him that he was not under arrest and was free to

leave their presence at any time. (N.T. Suppression Hearing, pp. 13, 33-

34). The location of the interview was within an office at Ferrebee's

workplace, not at a law enforcement venue. The interview lasted

approximately 45-50 minutes, and agents at times left the suspect alone

on a comfortable couch. There were no coercive tactics used by the

agents: the tone of their questioning was not hostile, the agents did not display their firearms (the guns were concealed under the agents' shirts and thus not visible to Ferrebee), and there was no physical restraint on Ferrebee's movement. (N.T. Suppression Hearing, pp. 11, 13, 16, 17, 27, 115, 118, 119). Moreover, it is clear that Ferrebee voluntarily submitted to questioning: he was cooperative throughout his interactions with the agents, consenting to a search of his iPhone, permitting agents to assume his online presence in an effort to cooperate, consenting to a polygraph examination, and later voluntarily traveling by himself to the state police barracks for the polygraph, and voluntarily waiving his *Miranda* rights at the barracks, and leaving by himself after the interview and polygraph. (N.T. Suppression Hearing, pp. 16-19, 20, 21, 22, 60-61, 70, 71, 72-74, 80-83, 97, 118).

In short, nothing was said or done by the agents which indicated that they would not have heeded a request to depart or allow Ferrebee to do so. *United States v. Willaman*, 437 F.3d at 359. Here, the totality of circumstances show that Ferrebee's freedom was not restrained at all, let alone to a degree associated with a formal arrest. *Oregon v.*

*Mathiason,* 429 U.S. 492 (1977) (defendant not in custody where he came to the police station voluntarily, was informed that he was not under arrest, and left the interview without hindrance); *United States v. King*, 604 F.3d 125, 138–39 (3d Cir. 2010) (defendant not in custody at FBI office interview when he was expressly told he was not under arrest, could have exited the office at any time, and there was no evidence that agents used coercive tactics); *United States v. Arena*, 629 Fed. Appx. 453, 457 (3d Cir. 2015) (not precedential); *United States v. Morgan*, *supra* (suspect not in custody where two-hour interview conducted at suspect's workplace, no display of weapons or hostile tactics by agents, and suspect was told he was free to leave at any time); *United States v. Killingsworth*, 118 Fed. Appx. 649, 650-52 (3d Cir. 2004) (not precedential); *United States v. Rodriguez*, No. 1:09-CR-00219, 2010 WL 1485704, at *6–8 (M.D. Pa. Apr. 12, 2010). Ferrebee was not in custody and his statements to police at the campground should not be suppressed.

### 2. Ferrebee Voluntarily Waived his *Miranda* Rights at the State Police Barracks

The defendant next claims that his signed waiver of *Miranda* rights at the state police barracks was not voluntary. This claim, too, is meritless.

On June 2, 2016, after the initial non-custodial interview at his workplace during which Ferrebee voluntarily agreed to cooperate with agents by allowing them to assume his online presence and voluntarily agreed to take a polygraph later in the day at the state police barracks, Ferrebee traveled by himself to the state police barracks and met with agents and the polygrapher. There, he was provided with a written copy of his *Miranda* warnings and waiver of rights form, which he read and signed. After voluntarily waiving his *Miranda* rights, Ferrebee made additional incriminating statements to agents about his online conversation via the Kik Messenger with D.M., including his admission that he asked D.M. to take pornographic photos of herself and send them to him, and threatened to post embarrassing things about her online if she did not do as he said. He also admitted to engaging in similar conduct with four-to-six girls under age 18.

Ferrebee in essence contends that the circumstances of his campground interview discussed above rendered his subsequent Mirandized statement at the state police barracks involuntary, claiming it is the "fruit of the poisonous tree." As noted above, however, Ferrebee's statement to agents at the campground was made in a non-custodial setting and was clearly voluntary when viewed in the totality of the circumstances. No *Miranda* warnings were required.

Assuming that Miranda warnings were required at the initial interview at the campground, Ferrebee's second interview at the state police barracks, which was preceded by a signed waiver of his *Miranda* rights, should not be suppressed as "fruit of the poisonous tree."

The defendant cites *Missouri v. Seibert*, 542 U.S. 600 (2004) to support his "fruit of the poisonous tree" argument for suppression of the statement made at the state police barracks. As the Third Circuit Court explained in *United States v. Kiam*, 432 F.3d 524, 531-33 (3d Cir. 2006), *Seibert* involved an "official, widespread police protocol which directed officers to interrogate suspects extensively without Miranda warnings, obtain a confession—which the officers knew could not be used in

court—then adjourn briefly, return and give the suspect his Miranda
rights, and re-elicit a now-valid confession." *Id.* A plurality of the
Supreme Court in *Seibert* applied a five-part test to decide the
admissibility of a second confession given after a pre-Miranda
admission in that case. Justice Kennedy's concurring opinion in *Seibert*,
however, suggested a two-part test, which the Third Circuit has
adopted. *Kiam*, 432 F.3d at 532.

Under *Kiam*, the court must first decide whether agents made a
deliberate choice to flout *Miranda* during the initial interview. If they
did not, that ends the inquiry and the pre-*Miranda* statement is
admissible "absent coercion or improper tactics in obtaining the initial
statement." *Kiam*, *supra* at 531, quoting *Oregon v. Elstad*, 470 U.S. 298,
314 (1985). If agents did deliberately flout *Miranda*, the subsequent
Mirandized statement is still admissible if "curative" measures were
taken by agents.

Here, there is no allegation that agents deliberately flouted
*Miranda* during the first interview. Instead, agents arrived at the
campground (Ferrebee's workplace), informed him that he was not

under arrest and was free to leave at any time, and Ferrebee voluntarily agreed to be interviewed. The interview took place in a campground office and agents were not hostile, threatening, or physically restraining toward Ferrebee. Under the holdings and reasoning of *Elstad* and *Kiam*, Ferrebee's Mirandized statement at the state police barracks is admissible, even if his first statement at the campground was made in violation of *Miranda*.

### 3. Ferrebee's Statements Were Voluntary

Ferrebee also generally alleges that both statements were involuntary and should be suppressed. In determining whether a suspect's statements were voluntary, courts look to the totality of circumstances to see if agents obtained the statements by overbearing the will of the suspect. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In determining whether a suspect's will was overborne, courts assess the details of the interrogation and the characteristics of the accused. *United States v. Montgomery*, 403 Fed. Appx. 674, 676 (3d Cir. 2010) (not precedential).

As noted above, the circumstances of the first statement at the campground clearly show that it was a voluntary statement, made without threats, coercion, or deception on the part of federal agents. *See United States v. Hallford*, 816 F.3d 850, 858-59 (D.C. Cir. 2016) (statements voluntary where defendant not pressured, interview occurred in non-police dominated atmosphere, agents asked straightforward questions and were not hostile, and no threats or promises made); *United States v. Umana*, 750 F.3d 320, 345 (4th Cir. 2014); *United States v. Heller*, 551 F.3d 1108, 1112-13 (9th Cir. 2009).

With regard to the second, Mirandized statement made at the state police barracks later that same day, those circumstances, too, show that it was a voluntary. The Third Circuit has explained that,

> [a] defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Two factors affect this determination: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of

> comprehension may a court properly conclude that the
> *Miranda* rights have been waived.   *Moran v. Burbine,* 475
> U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005); *United States v. Richardson*, 265 Fed. Appx. 52, 55 (3d Cir. 2008).

Here, as noted above, Ferrebee traveled on his own to the state police barracks for the interview and polygraph. He voluntarily signed a standard waiver of *Miranda* rights and voluntarily spoke to agents and the polygrapher. "[T]here is no evidence in the record that law enforcement officials coerced or deceived him in order to obtain a waiver of his Fifth Amendment rights." *United States v. Richardson*, *supra* at 55.

With respect to the characteristics of the accused, in *Richardson*, the Third Circuit upheld the validity of a *Miranda* waiver and voluntariness of a confession where the defendant had a low I.Q., learning disabilities, and attended special education classes. Here, Ferrebee, as noted in his brief, is of average intelligence, has good health (other than Type-1 diabetes, which he controls by taking insulin and dieting), has never been prescribed any psychotropic medication,

19

has no history of substance abuse, and is employed at the aforementioned campground. He answered the agents' questions intelligently. He was coherent and cooperative. There is no evidence in record, as defendant claims in his brief, that Ferrebee "was suffering from an average blood sugar level" or that his diabetes in any way interfered with his mental processes that day. He indicated in writing that he understood his *Miranda* rights and was willing to speak to agents without an attorney. There is no allegation that agents threatened him or pressured him to waive his rights. Ferrebee's statements were voluntary.

The defendant in his brief claims that he "felt pressured and coerced to answer questions" and did not "feel that he had the right to refuse to answer the questions and terminate the interview." There is nothing in the record to support that assertion. Ferrebee did not testify at the suppression hearing.

### 4. Ferrebee's Consent to Search the iPhone and Other Devices was Voluntary

Ferrebee also claims that he did not voluntarily consent to the

search of his iPhone and thumb drives. He claims that the facts surrounding his interviews and statements noted above show that his consent was not freely and voluntarily given.

The Third Circuit Court has set forth the legal principles governing consent searches and the analysis courts must use to determine whether a defendant's consent to search was voluntary:

> "It is ... well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Jimeno,* 500 U.S. at 250–51, 111 S.Ct. 1801.
>
> To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
>
> There is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041. Instead, we determine the voluntariness of a consent by examining the totality of the circumstances. *See id.* at 227, 93 S.Ct. 2041.

> Both "the characteristics of the accused and the details of the interrogation" are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should "turn[ ] on the presence or absence of a single controlling criterion."[6] *Id.* at 226, 93 S.Ct. 2041.
>
> Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment. *See id.*; *see also United States v. Kim,* 27 F.3d 947, 955 (3d Cir.1994). We have further identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." *United States v. Givan,* 320 F.3d 452, 459 (3d Cir.2003).

*United States v. Price*, 558 F.3d 270, 277–79 (3d Cir. 2009). Moreover, consent to search may be express or implied, and need not be knowing or intelligent, and may be given unintentionally and without the knowledge of the right to refuse consent. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005).

The nature of the agents' interaction with Ferrebee, as well as his personal characteristics, have been described above. There is no evidence in the record that on the date of the interview Ferrebee's ability to understand what was going on and his ability to consent was

affected in any way by his diabetic condition.3  The consent to search forms signed by Ferrebee informed him of his right to refuse to consent to the searches, stated his understanding that anything discovered by agents in the search could be used against him in a criminal proceeding, and acknowledged that he was consenting freely and voluntarily, and stated that his consent to the searches was not the result of any promises, threats, coercion, or intimidation.

Here, the totality of the circumstances, including the signed consent forms, show that Ferrebee's consent was voluntary. *See United States v. Brown*, 627 Fed. Appx. 163, 166–67 (3d Cir. 2015) (not precedential); *United States v. Martinez*, 460 Fed. Appx. 190, 194 (3d Cir. 2012) (not precedential); *United States v. Hernandez*, 76 F. Supp. 2d 578, 581 (E.D. Pa. 1999) (finding voluntary consent where defendant signed a consent form explaining the police do not have a warrant and

---

3 Ferrebee's mother testified about how the defendant's blood sugar levels may affect him when they are too high or too low. However, there was no testimony that Ferrebee's blood sugar levels were too high or too low on the date and at the times he was interviewed by agents, waived his *Miranda* rights, and consented to a polygraph and to searches of his devices.

there is a constitutional right to refuse permission to search), *aff'd*, 263 F.3d 160 (3d Cir. 2001); *United States v. Baer*, No. CR 15-417, 2016 WL 4718214, at *6 (D.N.J. Sept. 9, 2016). Ferrebee's motion should be denied.

Respectfully submitted,

DAVID J. FREED
United States Attorney

/s/ Francis P. Sempa
Francis P. Sempa
Assistant U.S. Attorney
ID #41294
Suite 311, Federal Building
P.O. Box 309
Scranton, PA 18501
(570) 348-2800
fran.sempa@usdoj.gov

Dated: February 15, 2018

24

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on February 15, 2018, she served a copy of the attached:

<u>SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S</u>
<u>MOTION TO SUPPRESS STATEMENTS</u>
<u>AND PHYSICAL EVIDENCE</u>

by e-filng:

Joseph A. O'Brien, Esq.

/s/Luann Manning
_____

LUANN MANNING
Supervisory Legal Assistant