**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 16cr152** |
| | : | |
| **v.** | : | **(Judge Munley)** |
| | : | |
| **JOSIAH FERREBEE,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court is defendant's motion to dismiss for failure to comply with the Speedy Trial Act (Doc. 65) and motion to suppress evidence in this criminal matter. (Doc. 69). Having been fully briefed and a hearing held on the suppression motion, these matters are ripe for disposition.

## Background

On June 3, 2016, the United States filed a complaint against Defendant Josiah Ferrebee, charging him with persuading a minor to engage in sexual activity for the purposes of producing a visual depiction, in violation of 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(e). Magistrate Judge Joseph F. Saporito presided over the defendant's initial appearance on the same day. The defendant pleaded not guilty to the charges.

Four days later, the court granted the defendant's motion for a psychiatric examination. The evaluation was conducted at the Federal Detention Center, SeaTac between July 18, 2016 and September 6, 2016. The clinical staff at SeaTac concluded that the defendant does not suffer from a mental disorder that would substantially impair his ability to understand the nature and consequences of the court proceedings brought against him. Subsequent to the evaluation, the defendant was returned to Lackawanna County Prison, where he has since remained.

On August 9, 2017, the defendant filed a motion to dismiss the charges against him on the grounds that the United States failed to bring him to trial within seventy (70) days as required by the Speedy Trial Act, 18 U.S.C. § 3161(c)(1). On August 18, 2017, the defendant filed a motion to suppress evidence obtained by the United States in this investigation. The court held a hearing on the motion to suppress on December 15, 2017. After the hearing, the court ordered the parties to file supplemental briefs. The time for filing such briefs has now passed, and both motions are ripe for disposition.

**Discussion**

As noted above, the defendant has filed two motions. In his first motion, which is a motion to dismiss, the defendant argues that his continued detention

without trial is in violation of the Speedy Trial Act, 18 U.S.C. § 3161, and the indictment against him should therefore be dismissed. The defendant's second motion is a motion to suppress evidence. In this motion, the defendant argues that statements that he made while in police custody as well as physical objects seized by the government should be suppressed as this evidence was obtained in violation of his constitutional rights. The court will address each motion in turn.

## I.    Motion to Dismiss for Violation of the Speedy Trial Act, 18 U.S.C. § 3160

Under the Speedy Trial Act, the trial of a defendant who pled not guilty to the alleged commission of an offense as charged in an information or indictment "shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). " 'Congress enacted the Speedy Trial Act to give effect to the Sixth Amendment right to a speedy trial by setting specified time limits after arraignment or indictment within which criminal trials must be commenced.' " United States v. Lattany, 982 F.2d 866, 870 (3d Cir. 1992) (quoting United States v. Rivera Constr. Co., 863 F.2d 293, 295 (3d Cir. 1988)). "If the trial does not commence within the 70-day period, the Act requires that the indictment be dismissed." Rivera, 863 F.2d at 295 (citing 18 U.S.C. § 3162(a)(2)).

The Act does not mandate, however, that every criminal case go to trial within 70 days or face immediate dismissal. For example, in calculating the 70-day period prescribed by the Speedy Trial Act, "[d]elay resulting from any pretrial motion, from the date of the filing of the motion through the date of the prompt disposition of the motion, is excluded." United States v. Arbelaez, 7 F.3d 344, 347 (3d Cir. 1993). "Any pretrial motion, including a motion for extension of time, is a pretrial motion within the meaning of Section 3161(h)(1)(F) and creates excludable time, even if it does not in fact delay trial." Id. Relevant in this case, the Act also provides for the exclusion of certain periods from the "delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant." 18 U.S.C. § 3161(h)(1)(A).

Furthermore, time attributable to a delay is excluded from the 70-day time limit "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). The district court must state its reasons for granting an "ends of justice" continuance; however, the statement of reasons need not be made contemporaneously with the order to continue because the Act's "reasons" requirement is satisfied by subsequent memorandum explaining the court's decision. See United States v. Brooks, 697 F.2d 517, 522 (3d Cir. 1982). It is the defendant who bears the

4

burden of proving a violation of the Speedy Trial Act. <u>See</u> 18 U.S.C. § 3162(a)(2). Thus, the question before us is whether defendant has carried his burden and established that he has not faced trial by the appropriate date after subtracting excludable delays. We find that he has not.

After a careful review, we find that the defendant's proposed calculation of the days that should be excluded from the speedy trial clock is flawed and imprecise. When all excludable time is counted, the defendant's non-excludable time has not exceeded the 70-day period prescribed by the Speedy Trial Act.

In coming to this conclusion, we first look at when the Speedy Trial clock began to run. The defendant was arrested for child exploitation offenses and brought before the court for an initial appearance on June 3, 2016. The grand jury indicted him on June 14, 2016. Because the defendant appeared before the court prior to his indictment on June 14, 2016, the date of the indictment begins the countdown of the 70 days of the Speedy Trial Act. <u>See</u> 18 U.S.C. § 3161(c)(1) (stating that "the trial of a defendant charged in an information or indictment . . . shall commence within seventy days from the filing date . . . of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs); <u>see</u> <u>also</u> <u>United States v. Willaman</u>, 437 F.3d 354, 358 (3d Cir. 2006).

This case presents an interesting set of circumstances, however, that affect this June 14, 2016, start date. On June 6 ,2016, prior to the indictment being filed, the defendant filed a motion for a psychiatric examination to determine his mental competency. Both parties acknowledge that the law provides for the exclusion of time "resulting from the delay of any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant." 18 U.S.C. § 3161(h)(1)(A). More specifically, the filing of the motion for a psychiatric examination stops the Speedy Trial clock. U.S. v. Tinklenberg, 563 U.S. 647, 650 (2011). On June 6, 2016, however, as noted above, the Speedy Trial clock had not yet started. Therefore, when the Speedy Trial clock did "start" on June 14, 2016, it immediately stopped due to the pending motion for a psychiatric examination.

We next must determine when the Speedy Trial clock started running again. The defendant argues that it started again when his psychiatric examination at SeaTac was completed on September 6, 2016. The law provides, however, that excludable time for Speedy Trial purposes continues far beyond the psychiatric evaluation itself, and lasts until a determination of mental competency is made by the court. See U.S. v. Graves, 722 F.3d 544, 547 (3d Cir. 2013). Thus, we find that the Speedy Trial clock started running again on December 6, 2016, when the defendant was arraigned and the mental

competency results from his psychiatric evaluation were acknowledged by the court. Until December 6, 2016, no time had run against the Speedy Trial clock.

At this juncture, we agree with the defendant that the twenty-four (24) days that followed, between December 6, 2016 and December 30, 2016, do count against the Speedy Trial clock. The government argues that this time period is excludable because it was the time period set by the court for the preparation of pretrial motions. The Speedy Trial act does not, however, subject all pretrial motion-related delay to automatic exclusion, as the government suggests. See Bloate v. U.S., 559 U.S. 196, 206 (2010). Rather, it "renders automatically excludable only the delay that occurs '*from the filing* of the motion through the conclusion of the hearing on, or other prompt disposition of' the motion." Id. (emphasis added in Bloate) (citing subsection (h)(1)(D) of the Speedy Trial Act). The days between December 6, 2016, and December 30, 2016, therefore count toward the 70-day Speedy Trial clock.

The parties agree that the clock stopped once again on December 30, 2016, the date the defendant filed his first motion for an extension of time to file pretrial motions. This motion was disposed of on January 11, 2017. By way of an order, we held that "[t]he period of time from the signing of the order to the rescheduled date of trial shall be excluded under the Speedy Trial Act 18 USC §3161(h)(7)(a)." (Doc. 27). Various time extensions have occurred since our

January 11, 2017, order. The parties agree that all time from December 30, 2016, until the date of the instant accompanying order is excludable.

In summary, the Speedy Trial clock started running on June 14, 2016. It immediately stopped on the same day. The clock started again on December 6, 2016. It remained running until December 30, 2016. On December 30, 2016, the clock stopped, and it has yet to start again. Our calculation therefore leads us to the finding that a total of twenty-four (24) days have run against the 70-day Speedy Trial clock. Thus, there has been no violation of the Speedy Trial Act. The defendant's motion to dismiss will be denied.

## II.    Motion to Suppress

The defendant next seeks to suppress certain statements he made on June 2, 2016, to law enforcement officers on the grounds that the statements were the product of custodial interrogation; the defendant was not provided with his Miranda rights prior to the statements; and the defendant did not thereafter waive his Miranda rights voluntarily. The defendant also seeks to suppress physical evidence obtained by the government from searching his iPhone and thumb drives, on the grounds that the government did not obtain the defendant's valid consent before performing said searches. We will begin with an analysis of the defendant's statements and whether they should be suppressed by court for the purposes of this criminal matter.

## A. Statements Made to Law Enforcement Officers

On June 2, 2016, law enforcement officials questioned the defendant concerning the pending charges at his place of employment, Twin Grove Campground. The questioning took place in a back area of the campground convenient store, known as the camp lounge. Subsequent to this questioning, the defendant sat for a polygraph examination at the state police barracks in Jonestown. At this point, the parties agree that the police advised the defendant of his Miranda rights, and he signed a waiver of those rights. Throughout this time period, the defendant made various incriminating statements.

The defendant now seeks to have the statements he made while he was in the camp lounge suppressed on the grounds that he was subjected to a custodial interrogation and not provided with his Miranda warnings. He seeks to have the statements made after he was advised of his Miranda rights suppressed on the grounds that he did not voluntarily waive those rights.

### 1. Statements Made Prior to Miranda Warnings

The Supreme Court has held that the Self–Incrimination Clause of the Fifth Amendment "[bars] the introduction in federal cases of involuntary confessions made in response to custodial interrogation." Withrow v. Williams, 507 U.S. 680, 688 (1993). For incriminating statements elicited from a defendant during a custodial interrogation to be admissible, law enforcement officers must first

inform suspects that (1) they have the right to remain silent; (2) their statements may be used against them at trial; (3) they have the right to the presence of an attorney during questioning; and (4) if they cannot afford an attorney, one will be appointed for them. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478–79 (1966). The parties agree that the government did not advise the defendant of these rights up until the time of his polygraph examination. Therefore, to be admissible the statements made at the campground must not have been elicited during a custodial interrogation. Our task is to determine whether the questioning of the defendant at Twin Grove Campground amounted to a custodial interrogation.

"[C]ustodial interrogation" is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494 (1977) (quoting <u>Miranda</u>, 384 U.S. at 444). To determine whether a suspect is in custody, we examine "how a reasonable man in the suspect's position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984). The Third Circuit Court of Appeals has explained that: "For a person to be in custody when he has not been arrested, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so. " <u>United States v. Willaman</u>, 437 F.3d at 359

(internal quotation marks and citations omitted). Thus, the court has several factors to consider in determining whether a suspect is "in custody" including:

> (1) whether the officers told the suspect he was under arrest or free to leave;
> (2) the location or physical surroundings of the interrogation;
> (3) the length of the interrogation;
> (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and
> (5) whether the suspect voluntarily submitted to questioning.

Id. at 359–60.

After holding an evidentiary hearing on December 15, 2017, we make the following findings of facts:

On June 2, 2016, Homeland Security Investigations Special Agents executed a search warrant at the defendant's home in connection with a child pornography investigation. (Doc. 86, Suppress. Hr'g Tr. at 3-4). The defendant was not home at the time, as he was scheduled to work that day at Twin Grove Campground. (Id. at 5). Acting on a tip that the defendant would be in the Twin Grove Campground area, the agents proceeded to the campground store, where the defendant's mother was working. (Id. at 11). After making contact with the defendant's mother, at some point between 10:00 a.m. and 11:00 a.m., the agents requested that his mother contact the defendant and ask him to come to the campground store. (Id. at 30). The defendant complied and arrived at the campground store shortly thereafter. (Id.)

The defendant, his mother, and the agents then moved to the camp lounge to talk. (Id. at 12). The camp lounge, which was located off to the side of the store, was entered and exited via a large archway. (Id. at 9). The interview took place with the defendant seated on one portion of a large sectional couch, and two agents seated at the other portion of the couch. (Id. at 10). In addition to the couch, the room consisted of a television, pool tables, and other recreational games. (Id.)

When the defendant, his mother, and the agents sat down on the couch, the agents explained to the defendant that he was not under arrest, he was free to leave at any time, and that they had some questions pertaining to an investigation that they wanted to speak to him about. (Id. at 13). The defendant verbally agreed to talk with the agents. (Id.)

The interview lasted approximately 45-50 minutes. (Id. at 16). Throughout that time, the agents took several breaks from their questioning. (Id.) It appears that although several agents and officers were present at the campground, and even in the camp store, only two agents conducted the actual interview. (Id.) The defendant was also left alone at certain points during the interview. (Id.) At no point did the defendant ask to leave. (Id.)

At the conclusion of the interview, the agents asked the defendant if he was willing to submit to a polygraph examination. (Id. at 21). The defendant agreed,

and was instructed to meet the agents at the Pennsylvania State Police barracks at 2:00 p.m. (Id.) The defendant left the interview unaccompanied by law enforcement, and proceeded to get lunch. (Id.)

Based upon these facts, and applying the factors set forth above, we find that the defendant was not in custody when questioned by law enforcement officials on June 2, 2016 at Twin Grove Campground. Because he was not in custody, a reading of the defendant's Miranda rights was not necessary. During the interview, the defendant was seated in a lounge area that he was keenly familiar with, as both he and his mother worked at this facility. The room was entered and exited via a large archway as opposed to doors, and no evidence suggests that there were barriers preventing the defendant from leaving the room at any point. When the agents first arrived they identified themselves, and they informed the defendant that he was not under arrest and could leave the room if he so desired. The length of the interview was relatively short, 45-50 minutes, with several breaks taken throughout. No evidence indicates that the agents used coercive methods, raised their voices, used physical restraints, or displayed their weapons. The evidence does, however, indicate that the defendant voluntarily submitted to the questioning. The defendant eventually left the camp lounge unaccompanied by officers.

Accordingly, we find that the government did not subject the defendant to a custodial interrogation during the interview in the campground lounge on June 2, 2016, and the defendant was not entitled to a reading of his <u>Miranda</u> rights. No basis therefore exists for suppressing the statements he made at that time. We will deny the defendant's motion to suppress regarding this issue.

## 2. Statements Made After <u>Miranda</u> Warnings

Following the interview, the defendant went to the Pennsylvania State Police barracks in Jonestown for a polygraph examination. At this point, the defendant was read his <u>Miranda</u> rights. The government alleges that the defendant then waived those rights. The defendant now claims that the statements he made after waiving those rights should be suppressed, because the waiver was not signed voluntarily. We disagree.

Prior to admitting incriminating statements made by a defendant, the government must establish a voluntary, knowing and intelligent waiver of the accused's privilege against self-incrimination and his right to counsel. <u>Miranda</u>, 384 U.S. at 475. A waiver is voluntary, knowing and intelligent where it is: 1) not the product of intimidation, coercion or deception, but a free and deliberate choice; and 2) where the defendant is aware of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

In the instant case, Special Agent Baxter indicated that he read the defendant his rights, which appeared on a form. (Doc. 86, Suppress. Hr'g Tr. at 72). Agent Baxter read the form to the defendant, stopping after reading each right to confirm that the defendant understood. (Id.) Agent Baxter marked his own initials next to each right as he proceeded down the form, to indicate that each right had been read. (Id.) For every right, the defendant indicated his understanding. (Id.) At the conclusion of the form, the defendant signed his name, waiving those rights. (Id. at 73). There is no indication from the record that the defendant was under duress or coercion during this process, nor have we found evidence of deception on the part of the government.

Based upon these circumstances we find a valid waiver of <u>Miranda</u> rights, and the statements made by the defendant need not be suppressed.

**B. Physical Evidence Obtained by the Government**

Finally, the defendant seeks to suppress physical evidence that was searched by the government, namely: his iPhone and computer thumb drives. The defendant argues, generally, that he did not knowingly, voluntarily, and intelligently consent to the search of these items.

The Fourth Amendment of the United States Constitution specifically guarantees "(t)he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures ...."

Governmental searches conducted pursuant to a validly obtained warrant or reasonably incident to a valid arrest do not violate this guarantee. In the instant case, however, no search warrant was obtained. The government contends that the search and seizure are not unreasonable because consent was provided.

It is well settled that the government may undertake a search without a warrant or probable cause if an individual freely and voluntarily consents to the search. Kerns v. Chalfont–New Britain Twp. Joint Sewage Authority, 263 F.3d 61, 65 (3d Cir. 2001). Any evidence discovered during a validly consented to search may be seized and admitted at trial. United States v. Kim, 27 F.3d 947, 955 (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973)).

The question for us, therefore, is whether consent to search in the instant case was given freely and voluntarily. The Third Circuit Court of Appeals has explained voluntary consent as follows:

> As the Supreme Court instructed, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Schneckloth, 412 U.S. at 222, 93 S.Ct. at 2045 (internal quotation marks and citations omitted). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227, 93 S.Ct. at 2047–48. Thus whether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion. Certain factors that courts consider in determining whether confessions were voluntary, such as the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged, id. at 226, 93

S.Ct. at 2047, are relevant to our examination. See United States v. Velasquez, 885 F.2d 1076, 1081–83 (3d Cir.1989), cert. denied, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990).

Id.

Bearing these standards in mind, we will separately discuss the searches of the defendant's iPhone and thumb drives[1].

### 1. iPhone Search

The defendant argues that he did not provide valid consent for a search of his iPhone. As noted above, in determining whether consent was valid, we look at the facts in the record, and evaluate the totality of the circumstances. Our review reveals the following:

On June 2, 2016, during his interview at the camp lounge, Department of Homeland Security agents asked the defendant if he would consent to the search of his iPhone. (Doc. 86, Suppress. Hr'g Tr. at 62). The agents presented the defendant with a consent to search form, and explained to him what it was. (Id.) Special Agent Murray explained to the defendant that he had a constitutional right to refuse consent to the search, and that anything discovered as a result of the search could be used against him in a criminal proceeding. (Id. at 18). The defendant indicated his agreement, and together with Special Agent Rodriguez, they filled out the form, imputing various information such as the defendant's

---

[1] A thumb drive is a portable memory card that stores data. (Id. at 81). The drive is put into a computer, and all information saved on the drive is then imported to the computer. (Id.)

password and the phone's serial number. (Id. at 62) The defendant gave his written consent by signing the form on the indicated line. The process of getting the form, summarizing it for the defendant, and having it signed by the defendant took approximately three minutes. (Id. at 63).

After a careful review, we find that the defendant did knowingly, voluntarily, and intelligently consent to the search of his iPhone. The consent form was presented to the defendant shortly after the time the interview began, and as noted in the previous sections, the entire interview at the camp lounge lasted approximately 45-50 minutes. The defendant, who is twenty-two (22) years old, successfully graduated from high school in 2015. (Doc. 73, Def.'s Br. in Supp. at 2). The defendant himself contends that he is of average intelligence. (Id.) Further, there is no evidence in the record suggesting that the defendant's ability to understand what was going on and his ability to consent was compromised.[2] As such, we will deny the defendant's motion to suppress with regard to the information obtained from the search of his iPhone.

### 2. Thumb Drive Search

---

[2] The defendant's mother testified at the suppression hearing that the defendant is diabetic. (Id. at 109). She further testified that when his blood sugar level is unbalanced, the defendant is often confused. (Id.) There is no evidence, however, that the defendant's blood sugar level was unbalanced on the day in question.

The defendant also claims that the search of his thumb drives, which are portable computer storage devices, was unconstitutional, as he did not freely and voluntarily give the government his consent.[3] Similar to the above analysis, we review the circumstances around which the defendant gave the government consent to search those devices:

As we discussed above, after the June 2, 2016, interview at the campground, the agents asked the defendant whether he was willing to undergo a polygraph examination. (Id. at 20). The agents explained what the polygraph examination would entail, and the defendant agreed. The defendant drove himself to drive to the Pennsylvania State Police barracks later that afternoon to have the test administered. (Id. at 21). At the conclusion of the examination, Special Agent Baxter asked the defendant whether he would consent to allow the government to search his thumb drives, which he had on his person. (Id. at 80). The defendant, after indicating his agreement, was presented with a consent to search form by Special Agent Murray. (Id.) Special Agent Murray reviewed the form with the defendant prior to the defendant signing the form. (Id.) After the

_____

[3] The defendant contends that the search and seizure of his desktop computer and hard drive was also unconstitutional. (Doc. 89, Def.'s Br. in Supp. at 14). We have reviewed the transcript records carefully, and have found no mention by any party of either item. As such, we continue our analysis with respect to solely the defendant's thumb drives.

polygraph examination had concluded and the consent form was signed, the defendant left the police barracks. (Id. at 83).

In light of these facts, we find that the defendant did freely and voluntarily consent to the search of his thumb drives. The defendant consented at a time when he was not in police custody, as evidenced by his ability to come and go from the barracks as he pleased. The testimony demonstrates that the defendant had an opportunity to review the consent form with Special Agent Murray prior to signing it. Again, the defendant has presented no evidence that his ability to understand the form was compromised in any way, or that he was coerced into doing so. We will therefore deny the defendant's motion to suppress with regard to the search of his thumb drives.

**Conclusion**

Accordingly, the defendant's motion to dismiss for failure to comply with the Speedy Trial Act will be denied. When all excludable time is counted, the defendant's non-excludable time has not exceeded the 70-day period prescribed by the Speedy Trial Act.

The defendant's motion to suppress with regard to statements made during his interview with police agents at Twin Grove Campground and physical evidence obtained by law enforcement, i.e. the defendant's iPhone and thumb

drives, will also be denied. The defendant was not in custody at the time of his interview, and thereafter freely and voluntarily consented to the searches. An appropriate order follows.

**BY THE COURT:**

**Date: June 7, 2018**                 **s/ James M. Munley_____**
                                        **JUDGE JAMES M. MUNLEY**
                                        **United States District Court**