1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :
                           :
                           :
                           :
        vs                 :    3:CR-16-152
                           :
                           :
JOSIAH FERREBEE            :
                           :
                           :


        BEFORE:      THE HONORABLE JAMES M. MUNLEY

        PLACE:       COURTROOM NO. 3

        PROCEEDINGS: MOTION HEARING

        DATE:        DECEMBER 17, 2018


APPEARANCES:

For the United States:

FRANCIS P. SEMPA, ESQ.
U.S. ATTORNEY'S OFFICE
235 N. WASHINGTON AVENUE
3RD FLOOR
SCRANTON, PA 18503


For the Defendant:

JOSEPH A. O'BRIEN, ESQ.
OLIVER PRICE & RHODES
1212 SOUTH ABINGTON ROAD
CLARKS SUMMIT, PA 18411

2

1          MR. SEMPA:  Your Honor, it's his motion.

2          THE COURT:  Thank you, Mr. Sempa.  Thank you.

3          MR. SEMPA:  You're welcome.

4          MR. O'BRIEN:  Yes, Your Honor.  We are here to ask

5     the Court to consider pretrial release for Mr. Ferrebee.  Mr.

6     Ferrebee is a first offender, has no history of not appearing

7     for court.

8          THE COURT:  How old is he?

9          MR. O'BRIEN:  Twenty-two years old.

10         THE COURT:  Okay.  Good.

11         MR. O'BRIEN:  First offender, no history of failing

12    to appear for court.  He has a supportive family.  His --

13         THE COURT:  Wait a second.  No history of failing to

14    appear for -- to court.  You said to me in the beginning he has

15    no history -- no criminal history.

16         MR. O'BRIEN:  That's right.

17         THE COURT:  And then he was arrested and put in --

18    arrested and incarcerated?

19         MR. O'BRIEN:  That's right.

20         THE COURT:  So I mean, I don't know whether that's an

21    argument you can have.

22         MR. O'BRIEN:  Well --

23         THE COURT:  You know what I mean, Joe.

24         MR. O'BRIEN:  He could very well have had a previous

25    arrest that didn't result in a criminal history.

1         THE COURT:  He doesn't have a previous record.

2         MR. O'BRIEN:  No previous arrests or previous

3  conviction.  He was incarcerated for approximately three years.

4         THE COURT:  How long was he in prison?

5         MR. O'BRIEN:  30 months.

6         THE COURT:  Okay.

7         MR. O'BRIEN:  30 months awaiting trial.  Your Honor,

8  this is a case where I believe there are conditions that could

9  be used to ensure his appearance in trial.  Present in the

10 courtroom are his mother and her husband, his father and wife

11 and his grandparents.  They have a place for him to stay.  They

12 have a person to be with him at all times.  He will agree to a

13 condition no use of a computer.  He will agree to a condition

14 he be placed on monitoring.  I think there is a case there are

15 lot of conditions that can be used to allow him to be released.

16        In addition, Your Honor, there's the extra situation

17 here where he is a person with some pretty serious health

18 conditions, very severe diabetes.

19        THE COURT:  That's what it's all about.  Isn't that

20 why we're here because of his health condition?

21        MR. O'BRIEN:  Your Honor, I think he meets the

22 requirements.  The facts of the case would indicate he meets a

23 lot of the requirements for release.  Added to that becomes the

24 health condition.  Your Honor, we have been provided with

25 medical records, Your Honor.  There's a report from the -- from

1  a certified nurse practitioner who works with the endocrinology

2  office that he's being treated that says this is a life

3  threatening condition he has.  And there's also a question

4  about whether or not he's being cared for appropriately at the

5  prison.

6          I will give you -- one of things that stood out to me

7  was the -- was a statement made by Dr. Zaloga, who is the chief

8  doctor at the prison.  He said the following --

9          THE COURT:  What did he say?

10         MR. O'BRIEN:  I will read it, Your Honor.  We cannot

11 and will not discuss this patient's medical care with an

12 outside nurse practitioner nor perform testing because he urges

13 us to do so.

14         THE COURT:  He says nothing.

15         MR. O'BRIEN:  Pardon?

16         THE COURT:  I said he says nothing, Zaloga?

17         MR. O'BRIEN:  He won't discuss it with this nurse

18 practitioner who's written this report -- said he's in a life

19 --

20         THE COURT:  Did he respond to your request?

21         MR. O'BRIEN:  Who?

22         THE COURT:  Zaloga.

23         MR. O'BRIEN:  Yeah, he said he doesn't think he needs

24 it.  He says he thinks hes medical care is being provided.  He

25 won't even discuss it with an outside professional who he's

 1  been treating for that care for five years.

 2          MR. SEMPA:  Dr. Zaloga is here, by the way.

 3          MR. O'BRIEN:  That's basically our position, Your

 4  Honor, he needs -- he's in need of medical care that's not

 5  being provided, and I have a doctor who won't discuss it with

 6  him.

 7          MR. SEMPA:  Our position is that his medical care is

 8  being provided.  That's why have Dr. Zaloga here to testify to

 9  what has been happening.

10          THE COURT:  I read Dr. Zaloga's opinion, and I have

11  read this other one -- this other one.

12          MR. SEMPA:  Where is this person?  Why isn't she here

13  to testify?

14          THE COURT:  She's from Allentown.  That's why.

15          MR. SEMPA:  Get her here to testify.  I have a live

16  witness here who can testify was to how the prison has been

17  treating him.  I don't know anything about this other person.

18          THE COURT:  Joseph?

19          MR. O'BRIEN:  Well, you have a medical report from

20  her, Your Honor.  This isn't a trial.  We don't have to produce

21  witnesses.  Your Honor can consider medical reports in these

22  type proceedings.  Records are considered all the times in

23  these cases.  I can't think of one where live testimony was

24  taken in a release case.  It's always done on the basis of

25  records.  I think -- the thing that stands out to me is Dr.

6

1  Zaloga's statement he won't discuss it with the -- I mean,

2  isn't that nice?  A certified nurse practitioner what works

3  with an endocrinologist said he's in a life threatening

4  condition and the doctor said I won't discuss it because she's

5  not a doctor.  That tells me something.  I think all -- I think

6  this is a case where he's been in prison -- he's been there a

7  long time, the type of perfect case where you can put the type

8  of restrictions on him that will ensure the safety of the

9  community and it will also enable him to get the type of

10  continuing medical care he needs for his severe conditions.

11          THE COURT:  Yeah, okay.

12          MR. SEMPA:  Your Honor, I couldn't disagree more with

13  everything that Mr. O'Brien said.  We'll get to the medical

14  issues in a moment.  First of all, under the law as the Court

15  is well aware, there is a presumption because of the nature of

16  this charge that there's no condition or combination of

17  conditions that would assure his appearance at trial or protect

18  the community from this defendant.

19          That's a presumption.  That's a rebuttable

20  presumption, but I submit to you it hasn't been rebutted and it

21  hasn't been rebutted for the factors under 3142, the Bail

22  Reform Act.  The nature and circumstances of this offense.

23  Let's recall what this is about.  This defendant gets online,

24  chats with a 15-year-old girl --

25          THE COURT:  Okay.  Now --

1          MR. SEMPA:  Your Honor, that --

2          THE COURT:  It's a serious offense, what the charges

3  are.  I'm talking -- the reason we're here today because of his

4  condition, and we have a physician who says he's being taken

5  care of.  We have somebody else who says he is in extreme

6  condition, okay.  That's the difference.  That's the reason

7  here we're here.

8          MR. SEMPA:  Then I'll put Dr. Zaloga on the stand,

9  Your Honor.

10         THE COURT:  All right.  Well --

11         MR. SEMPA:  Dr. Zaloga is here.  I got Mr. Ferrebee's

12 medical file here, okay, from the prison.  Dr. Zaloga has filed

13 a report with the Court and with the probation office

14 indicating that the treatment of this person is entirely

15 appropriate.  He has some very recent -- a recent document he

16 handed me today saying that the toe seems to be fine that Mr.

17 Ferrebee has been complaining about, and he can inform the

18 Court exactly how the prison has been treating him, exactly why

19 -- why in many --

20         THE COURT:  We will hear from Dr. Zaloga, huh?  Okay.

21 Dr. Zaloga.

22         EDWARD ZALOGA, called as a witness, being duly sworn,

23 testified as follows:

24         THE COURT:  Dr. Zaloga, good afternoon.

25         THE WITNESS:  Good afternoon.

1  DIRECT EXAMINATION

2  BY MR. SEMPA:

3  Q.    Sir, can you state your name for the record, please?

4  A.    Edward Zaloga.

5  Q.    And how are you employed?

6  A.    I'm employed by a company called Correctional Care which

7  provides healthcare services at various correctional

8  facilities.

9  Q.    Okay.  Can you tell the Court about your professional

10 background?

11 A.    I am a physician since 1988.  So it's 30 years now.  I am

12 board certified in both internal medicine and the subspecialty

13 of nephrology, which is diseases of the kidney.

14 Q.    And are you currently -- do you currently work at the

15 Lackawanna County Prison?

16 A.    Yes.

17 Q.    What do you do there?

18 A.    I'm the chief medical officer.  I take care of the -- all

19 of the medical care.  I supervise.

20 Q.    You supervise a staff of how many at the prison?

21 A.    Probably 20 to 25 people.

22         THE COURT:  You have -- you have a staff up there of

23 20 people?

24         THE WITNESS:  We have 900 inmates as of this morning.

25         THE COURT:  I didn't know --

9

1          THE WITNESS:  It's a 24/7 operation, Your Honor.

2          THE COURT:  But the employees, are they -- are they

3   guards or --

4          THE WITNESS:  No, these are healthcare folks, nurse

5   practitioner, dentist, psychiatrist, registered nurses.

6          THE COURT:  Full-time?

7          THE WITNESS:  Some are.  Some aren't.

8          THE COURT:  Okay.

9   BY MR. SEMPA:

10  Q.    Thank you.  You oversee their treatment of the inmates at

11  the Lackawanna County Prison?

12  A.    Yes.

13  Q.    How long have you been in that position?

14  A.    We just started our 15th year.

15  Q.    I'm going to show you what I have marked as exhibit 1.  I

16  will ask you if you can identify this.

17  A.    This is my resume.

18  Q.    Okay.  This is your C. V.  This talks about your

19  experience, training, background, things like that, correct?

20  A.    Yes.

21          MR. SEMPA:  Your Honor, I move to admit exhibit 1

22  into evidence.

23          THE COURT:  No objection?  It's admitted.

24          MR. O'BRIEN:  No objection.

25  BY MR. SEMPA:

10

1  Q.   Now, Dr. Zaloga, are you familiar with Mr. Ferrebee?

2  A.   Yes.

3  Q.   The defendant in this case?

4  A.   Yes.

5  Q.   You're familiar with the treatment that he's received at

6  the Lackawanna County Prison?

7  A.   Yes.

8  Q.   And, in fact, you have a copy of his medical records.  Is

9  that correct?

10 A.   Yes.

11 Q.   I will show you what's been marked as Government's Exhibit

12 2 and ask if you can identify this.

13 A.   This is Josiah Ferrebee's medical record, which was

14 produced by our secretary on December 12th, 2018 at 12:50 in

15 the morning.

16 Q.   What does that record consist of?  Are there separate

17 parts to that record?

18 A.   The record is divided, if you will, into two sides.  One

19 side includes various lab and X-ray reports, some

20 administrative paperwork.  He's been there twice.  So there's

21 two intake assessment forms.  We have old medical records --

22 whatever we were able to obtain.  We have sick call requests

23 and then a master problem list.  That's on the one side.  Sick

24 call requests are similar to you calling your doctor and making

25 an appointment.  You call your family doctor.

1  Q.    How does that work in the prison?

2  A.    Correctional officers aren't supposed to see or hear

3  anything about medical.  So the patients take and write down on

4  a piece of paper whatever their requests are, complaints, put

5  them in a lock box on their housing unit.  Every day usually at

6  the end of the three to 11 shift or start of the 11 to 7 shift

7  the nurse will go around and collect them all, bring them back

8  to the medical department and then file them in -- I don't know

9  if you ever seen an old post office box with the little slots.

10 We have them divided -- each housing unit divided by slot,

11 D.A., D. B., D. C., alpha, et cetera.  They do that at night.

12      In the morning when I come in, I go through them all and

13 triage them, do a medical triage to see who needs to be seen

14 right now, who can wait, who needs to see me, who needs to see

15 our nurse practitioner, who can see the nurse, basically just

16 triaging the complaints.

17 Q.    Does that medical record contain all of Josiah Ferrebee's

18 requests to see a doctor or a medical professional?

19 A.    It is all of them we have received.

20 Q.    And in each instance, are there notations in the medical

21 record that these requests were responded to?

22 A.    Yes.

23 Q.    Okay.  And in many cases by a medical professional; is

24 that correct?

25 A.    In all cases.

1  Q.   Now, you're aware, are you, not, of Mr. Ferrebee's

2  condition of diabetes, correct?

3  A.   Yes.

4  Q.   All right.  Has that condition been monitored ever since

5  he's been at the prison?

6  A.   Yes.

7  Q.   And how does that monitoring take place?

8  A.   When he first came into the prison, we would obtain his

9  old medical records or at least contact his pharmacy and his

10  physicians to find out what is his current therapy.  We then

11  try to restrict his dietary intake so that we can control his

12  sugars better.  We give him insulin, two different kinds of

13  insulin, a longer acting insulin, which is equivalent to the

14  pancreas giving out their basal level.  Then we have extra

15  insulin given with meals.  We monitor his blood sugars four

16  times a day, before breakfast, before lunch, before dinner and

17  again at bedtime, and we adjust the insulin accordingly.

18  Q.   You say you monitor.  How could you do monitoring four

19  times a day?

20  A.   There are sheets in here -- the nurse goes around --

21  different nurses on different shifts will go around and -- can

22  I show you, Your Honor?

23          THE COURT:  Oh, yeah, sure.

24          THE WITNESS:  These are his sheets.  It's called a

25  diabetic flow sheet.

1  BY MR. SEMPA:

2  Q.    Speak up.

3  A.    The nurse will come in.  This is July 1 at 6 a.m., check

4  his blood sugar and give him the long acting Lantus insulin.

5  Then she checks it at noon, 4:00 and 9:00.  That continues

6  since he's been there.  This is all of his -- these are the

7  records of the medicines he was administered.  This is the

8  Lantus when he was given it, how much, the accu-checks are --

9  the regular insulin, short acting is done based on what the

10  blood sugar was.

11      It's the equivalent what the pancreas does when you have a

12  Snickers bar.  Your blood sugar goes up, your pancreas squeezes

13  out a little extra.  I mean -- but they are all here.

14              THE COURT:  Thank you.

15              MR. SEMPA:  Go ahead.  So there's a daily monitoring

16  of his diabetic condition?

17              THE WITNESS:  Yes.

18  BY MR. SEMPA:

19  Q.    And a response to that condition by medical treatment with

20  the insulin you just mentioned, correct?

21  A.    Yes.

22  Q.    Now, you stated that you try to control his dietary

23  intake.  What do you mean by that?

24  A.    Well, we put -- all diabetics are put on a diabetic diet.

25  Depending on their body weight, we will restrict their caloric

1 intake they are given by the kitchen to -- sometimes 1,500,

2 sometimes 1,800, sometimes 2,000 calories.  We rarely go over

3 2,000 calories a day.  It's divided into three meals.  We then

4 try to restrict what they can buy in commissary.  The

5 commissary is, like, you go to the store -- your local store

6 and by chips, pretzels, candy, whatever.  They order that.  The

7 inmates order that once a week, and they keep it in their cells

8 and eat it.

9 Q.   You say you try to control it.  Is there any way to

10 prevent them from getting what they want from the commissary?

11 A.   We can write an order and restrict their commissary

12 through what is called the offender management system, the

13 prison's electronic system that does the ordering and the

14 charging and all that stuff.

15      But what happens is sometimes if you and I were cellmates

16 and I have a restriction and you don't, I will give you the

17 money or my family will put the money on your books and you'll

18 buy the candy for me.  I am not saying that went on here

19 because he actually had commissary here.  He was getting

20 commissary.  I am not sure how, but we have the records of it.

21 Q.   Okay.  And part of that commissary record was part of what

22 your -- what you produced to the probation office and to the

23 Court; is that correct?

24 A.   Yes.

25 Q.   I will mark this as exhibit 3:  I'm showing you what's

1  been marked as exhibit 3.  Is that what you produced in

2  response to the petition filed by Mr. Ferrebee?

3  A.    Yes, sir.

4  Q.    Okay.  And is there a part of that that deals with this

5  commissary you're talking about?

6  A.    It is exhibit No. 2.

7  Q.    You called it exhibit No. 2.  I just lined them and put

8  them in order, his complaint and -- the commissary that -- the

9  record that you have in there, does it indicate that he had

10  been ordering from commissary things that a diabetic shouldn't

11  order?

12              THE COURT:  Should what?

13              MR. SEMPA:  Should not order.

14              THE WITNESS:  I can read a few if you would like.

15  BY MR. SEMPA:

16  Q.    Sure.

17  A.    I will start and go backwards.  November 23rd, 2018,

18  jalapeno cheese nuggets, duplex cookies, cherry danish, snack

19  crackers, cheese dip jalapeno; October 28th, Baby Ruths,

20  Hershey chocolate bars, honey buns, summer sausage, Pop Tarts,

21  snack crackers, more Pop Tarts -- I am reading backwards in

22  reverse order, nutty bun, honey bun, pretzels with honey and

23  mustard, snack crackers, cherry danish, pretzels, snack

24  crackers, butterscotch discs.

25  Q.    What is the significance of him ordering these type of

16

1  things the fact he's a diabetic?

2  A.   This causes his sugars to spike, to go higher.  It's

3  something diabetics generally don't consume.

4  Q.   And has he been told that by the medical professionals the

5  prison?

6  A.   Yes.

7       MR. O'BRIEN:  I will object to that unless he told

8  him himself.  That's hearsay.

9       THE COURT:  I don't know what you are saying.

10      MR. O'BRIEN:  I'm objecting to the testimony of was

11  he told something by medical professionals on the grounds that

12  it is hearsay unless Dr. Zaloga told him that himself.

13      MR. SEMPA:  Your Honor, there's a medical exception

14  to the hearsay rule.  And here we are trying to find out

15  whether or not he's being treated appropriately.  This is the

16  doctor that is supervising the medical professionals that deal

17  with him.

18      MR. O'BRIEN:  I know of no medical exception to the

19  hearsay rule.  I am not an expert on the hearsay rule.  I don't

20  see --

21      THE COURT:  I am going to sustain your objection.  Go

22  ahead.

23  BY MR. SEMPA:

24  Q.   Now, are you aware that Mr. Ferrebee complained about his

25  toe as it relates to his diabetic condition?

17

1    THE COURT:  What?  What did you say?

2  BY MR. SEMPA:

3  Q.    Are you aware Mr. Ferrebee complained about his toe as it

4  relates to his diabetic condition?

5  A.    Many times.

6  Q.    Okay.  And what was done by the staff at the Lackawanna

7  County prison -- the medical staff in relation to that

8  situation?

9  A.    Each time he would complain he was brought down to the

10  medical department and seen by either the nurse practitioner or

11  the nurse and appropriate treatment was rendered.

12  Q.    What kind of treatment was provided and -- can you tell us

13  what was the nature of the problem with his toe?

14  A.    He was cutting his toenails too short, and they were

15  growing -- he was developing ingrown toenails.  And we would

16  get them, and they would start to get infected.  What would

17  happen is we would start antibiotics orally.  We would then do

18  local wound care with general triple antibiotic ointment,

19  peroxide ointment twice a day.  The nurse practitioner would

20  numb his toe up and just take out the piece that was growing

21  in.  That was done multiple times.

22  Q.    Was this a life threatening condition?

23  A.    No.

24  Q.    I am going to show you what's been marked Government's

25  Exhibit 4 and ask if you can identify that.

18

1  A.    This is -- I made this copy this morning from his progress

2  record.  It wasn't a copy from last week.  The final note was

3  from December 15th at 10:40 in the morning.  The nurse saw him

4  for his treatment.  He was being seen twice a day for it.

5  There was no redness, no scabbed area on his right great toe.

6           THE COURT:  His foot?

7           THE WITNESS:  I'm sorry, great toe, Your Honor.  The

8  treatment was completed and terminated.

9           THE COURT:  When did she see him?

10          THE WITNESS:  Two days ago, 10:40 in the morning,

11 December 15th.

12 BY MR. SEMPA:

13 Q.    There's nothing life threatening about his great toe

14 infection or what used to be an infection?

15 A.    No.

16 Q.    Okay.  Now, you were in the courtroom when Mr. O'Brien was

17 talking about a nurse practitioner that Mr. Ferrebee mentioned

18 in his petition and your response that you have not discussed

19 the matter with the nurse practitioner, correct?

20 A.    Correct.

21 Q.    Can you explain your reason to the Court?

22 A.    First of all, Your Honor, I'm prohibited by HIPAA from

23 discussing his medical care with anyone outside, okay.  Second

24 of all, the nurse practitioner has far less training and

25 experience than I do in treating diabetic patients and their

19

1  complications.  I don't feel there's anything that person had

2  to offer that I would act upon.

3          THE COURT:  All right.

4          THE WITNESS:  Just so Your Honor is clear, the

5  petition talked about his endocrinologist and the names a nurse

6  practitioner.  Nurse practitioners are not endocrinologists.

7  Endocrinologists are physicians who are board certified in

8  internal medicine and then subspecialize endocrinology.

9  BY MR. SEMPA:

10  Q.   Approximately how many inmates at the Lackawanna County

11  prison suffer from diabetes?

12  A.   It varies from day to day.  Insulin dependant diabetics

13  are anywhere from 10 to 20.  Non-insulin diabetics may be 20 to

14  30.  So anywhere from 40 -- 30 to 50 on a given day.

15  Q.   And are they treated -- are the insulin dependant inmates

16  at the Lackawanna County prison treated any differently from

17  Mr. Ferrebee?

18  A.   No.

19  Q.   And during your -- the course of your professional career

20  as a physician, how many diabetic patients have you treated?

21  A.   Hundreds.

22  Q.   Okay.  Now, in his petition he said it was, quote, urgent

23  for him to be seen by an endocrinologist for his diabetes.

24  What is your position with respect to it is urgent for him to

25  see an endocrinologist?

1  A.    In my professional opinion, there's nothing urgent about

2  it.   I mean, what Mr. Ferrebee needs to do is he needs to

3  control his diet and comply with the nurses when they want to

4  give him insulin and just -- we will control his sugars.

5  Q.    And his blood is continued to be monitored four times a

6  day?

7  A.    Yes.

8  Q.    He also in his petition said it was urgent for him to be

9  seen by an optometrist for his eyesight.  What have you done

10 with respect to that?

11       THE COURT:  What was the question?

12       THE WITNESS:  He wanted to see an optometrist, Your

13 Honor, an eye doctor.  That appointment was scheduled, and we

14 don't know -- I don't personally know when they're scheduled.

15 And the patient can't know either for security purposes.

16 Ironically he was scheduled for 11:00 this morning.  And when I

17 came in this morning, I saw that.  And I thought we can get him

18 there and get him back, but he had already left.  The U.S.

19 marshals had already taken him.  We rescheduled him for an

20 optometrist.

21 BY MR. SEMPA:

22 Q.    He was scheduled for an optometrist appointment today?

23 A.    Yeah.

24 Q.    And because of this proceeding, that wasn't able to take

25 place, but you have rescheduled him?

21

1  A.    Yeah, what happened was if he had just written to us and

2  asked these questions, we would have taken care of it as we

3  always do.

4  Q.    There's nothing in his request box related to he needs to

5  see an optometrist?

6  A.    His requests are all about his toe.

7            THE COURT:  Okay.

8  BY MR. SEMPA:

9  Q.    He says that treatment for his diabetes and for his

10 eyesight, his feet, the medical staff has refused to provide.

11 Is that true?

12 A.    I think the records speak for themselves, Your Honor.

13           THE COURT:  Okay?  How far you going to go with this?

14 I think I have the essence the doctor's report, okay.

15           MR. SEMPA:  Okay.  That's all I have.

16           THE COURT:  Good.  Joseph?

17 BY MR. O'BRIEN:

18 Q.    Doctor, you're the medical director at the prison?

19 A.    Yes.

20 Q.    You said you have 90 people working for you?

21 A.    No.

22 Q.    How many?

23 A.    I said 20 to 25.

24 Q.    20 to 25.  Now, of those 20 to 25, how many of them are

25 doctors?

22

1  A.    One.

2  Q.    That's you?

3  A.    No.  I have a psychiatrist who works for me.  He's a

4  physician.

5  Q.    A psychiatrist.  So general practitioner -- doctor, it's

6  just you?

7  A.    I'm not a general practitioner.  I am an internist and

8  nephrologist.

9  Q.    So internist is just you?

10 A.    Yes.

11 Q.    How many times did you see Mr. Ferrebee?

12 A.    As many times as he requested it.

13 Q.    How many times was that?

14 A.    Zero.

15 Q.    Now, Doctor, of these other employees, you have one

16 psychiatrist.  Is he there full-time?

17 A.    No.

18 Q.    Is he there basically as needed?

19 A.    No.

20 Q.    How often is he there?

21 A.    He's there three times a week anywhere from three to four

22 hours each time.

23 Q.    Now, the other 20 or so, what are they, you called -- you

24 said all medical professionals?

25 A.    Yes.

23

1          THE COURT:  What?

2          MR. O'BRIEN:  All medical professionals.

3          THE WITNESS:  Yes, except the lady who produced this

4   is the secretary.

5   BY MR. O'BRIEN:

6   Q.   What various subspecialty of the medical profession are

7   they?

8   A.   We have a dentist who comes in once a week, spends the

9   whole day on Tuesdays.  I have a nurse practitioner that comes

10  in three days a week.  I have several R. N.s, three or four R.

11  N.s, and four or five L. P. N.s.  R. N.s are registered nurses.

12  L. P. N.s are licensed practical nurses.

13          THE COURT:  Are the R. N.s on site?  Are they

14  permanent employees?

15          THE WITNESS:  Yes.

16          THE COURT:  Full-time employees?

17          THE WITNESS:  Some are full-time.  Some are part

18  time, Your Honor.

19          THE COURT:  Okay.  How many on duty today, Doctor?

20          THE WITNESS:  Right now there's three nurses there.

21  When I left there today -- there's always -- the day shift is

22  generally three nurses plus the administrator.  Second shift is

23  three nurses.

24          THE COURT:  How many L. P. N.s?

25          THE WITNESS:  Right now -- three of them are L. P.

24

1  N.s today.  I was there with them all morning.

2  BY MR. O'BRIEN:

3  Q.   So, Doctor, it would then be your practice especially in

4  this case since you've never seen Mr. Ferrebee professionally

5  would be to rely on what the nurse practitioners and so forth

6  tell you?

7  A.   It would be my practice to rely on the lab values that are

8  monitored four times a day to treat his diabetes.

9  Q.   You get that information from nurse practitioners and

10  nurses and other professions?

11  A.   Yes.

12  Q.   Okay.  Because you've never seen Mr. Ferrebee?

13  A.   He never asked to be seen.

14  Q.   You have given various opinions, and you've never seen

15  him?

16  A.   He never asked to be seen.

17  Q.   You rely on what other people said?

18  A.   Counsel, when is the last time your doctor came to your

19  house asking if you want to be seen?  I mean, come on.

20  Q.   I didn't know I was on the stand, Your Honor.

21         THE COURT:  Just answer the question, Doctor.

22         MR. SEMPA:  Your Honor, he answered it three times

23  now.

24         THE COURT:  Well, I am allowing him to ask the

25  question.

25

1  BY MR. O'BRIEN:

2  Q.    Now, Doctor, in your report that you submitted dated

3  November 30th you talked about -- I am going to read you a

4  statement from there.  Calen Rumfeld (sp.) is not an

5  endocrinologist, practitioner he is a nurse practitioner and an

6  endocrinologist is a physician who is board in internal

7  medicine who then does a fellowship in endocrinology.  We

8  cannot and will not discuss this patient's medical care with an

9  outside nurse practitioner.  Was that a matter of pride with

10  you, Doctor?  Why did you say that?

11  A.    It's a matter of fact.

12  Q.    You can't -- what would prevent you from contacting this

13  nurse practitioner and discussing what was in her report?

14  A.    I never saw it.  I was never given a report.

15  Q.    You never saw the report?

16  A.    No, sir.

17  Q.    Did you ever review any of the records the probation

18  office had?

19  A.    Not that I recall, sir.

20  Q.    So this mention of this Calen Rumfeld this is something

21  that you learned about on November 30th or thereabouts?

22  A.    I learned about it with whatever your client submitted.  I

23  don't have it in front of me.  Whatever your client submitted

24  to the probation or the Court, that's how I learned about what

25  you're talking about.

26

1  Q.    You have seen it then?

2  A.    You have everything I have seen.

3  Q.    Have you seen the report?

4  A.    What report?

5  Q.    Calen Rumfeld?

6  A.    Show me the report, and I'll tell you.

7  Q.    Well, let me show you the report.  You say her claims are

8  false.  Are you making that statement without ever seeing the

9  report?

10  A.    If -- show me what you're asking me.  I can answer.

11  Q.    Paragraph two.

12  A.    Yeah.

13  Q.    Do you refer to a report from Calen Rumfeld in there?

14  A.    Not in paragraph two, no.

15  Q.    Paragraph four, I'm sorry.

16  A.    Okay.  What I am referring to is a document I received

17  from the probation office, a fax, which is your client's

18  petition.  That's what I was referring to.

19  Q.    But now what -- you had never seen the report of Calen

20  Rumfeld?

21  A.    What report?  All I have seen is what you have here,

22  counselor.  I don't recall seeing that.

23  Q.    You don't recall?

24  A.    No.

25  Q.    You did learn of the existence of Calen Rumfeld?

1  A.   From your client, yeah.

2  Q.   From the petition that was filed?

3  A.   Correct.

4  Q.   And did you request to consult with her or ask her for

5  records?

6  A.   No.

7  Q.   No?

8  A.   No.

9  Q.   You said the reason you didn't was because of HIPAA?

10 A.   There were two reasons.

11 Q.   Okay.  What was the second?

12 A.   The fact that I generally don't consult with people with

13 less training and experience than I and ask for things.

14 Q.   How many people that work for you have less training than

15 you?

16 A.   All of them.

17 Q.   You never consult with people that work for you?

18 A.   That's not what I just said.  They work for me.

19 Q.   You never consult with anybody with less experience unless

20 they happen to work for you, is that what you're saying?

21 A.   What I am saying this is an outside individual.  I have no

22 idea what credentials or experiences are.

23 Q.   Why didn't you ask?

24 A.   Because I didn't think it was necessary.

25 Q.   That's your concern for your patient, you didn't think it

28

1  was necessary?

2  A.    Excuse me?

3  Q.    You didn't think --

4  A.    No, I didn't, and I still don't.

5  Q.    How about the HIPAA issue?  You could have sent a release

6  and ask for a release, correct?

7  A.    I don't ask for releases.  Inmates or their patients or

8  their outside doctors can send me a release and request it.

9  Q.    Did you suggest to Mr. Ferrebee that he get release so you

10  can talk to Calen Rumfeld?

11  A.    I didn't feel it was necessary to talk to him.

12  Q.    Let's go through Calen Rumfeld's report.

13  A.    Can I see it?  Do you want to go through it?  I have never

14  seen it.

15        MR. SEMPA:  I've never seen it.

16  BY MR. O'BRIEN:

17  Q.    Do you believe Josiah has type one diabetes?

18  A.    Yes.

19  Q.    Do you believe it's a chronic disease requiring daily

20  blood glucose testing and injections?

21  A.    Yes.

22  Q.    Do you believe there's no cure for it?

23  A.    Not necessarily.  There are people who are doing islet

24  cell transplantation -- pancreatic islet cell transplants that

25  could theoretically cure it.

29

1  Q.    Generally do people remain on insulin for the rest of

2  their lives?

3  A.    Yes.

4  Q.    Do you believe it's a life threatening condition?

5  A.    Not necessarily, no.

6  Q.    Does it sort -- can't it kill people?

7  A.    That's not what I said.

8  Q.    Could it kill someone?

9  A.    Sitting here it could kill you.

10  Q.    Does it require appropriate being closely treated and

11  monitored?

12  A.    Yes.

13  Q.    How about annual or semiannual blood work?

14          THE COURT:  What?

15  BY MR. O'BRIEN:

16  Q.    Annual or semiannual blood work?

17  A.    It depends.

18  Q.    When would that be required and -- when would that be

19  suggested, and when would it not be suggested?

20  A.    I don't understand the question.

21  Q.    Well, you said -- I asked you whether type one diabetes

22  required annual or semiannual blood work.  You said it depends?

23  A.    Uh-huh.

24  Q.    When is it required?

25  A.    Depending on the degree of control the patient is under

30

1  I would do it.

2  Q.    How about this case?

3  A.    I did it.

4  Q.    You did it.  Do your records reflect blood work on a

5  semiannual basis?

6  A.    I didn't say it was needed on a semiannual basis.  I did

7  it in response to his request.

8  Q.    Had you done it before then?

9  A.    No.

10  Q.    And when was he admitted to the prison?

11  A.    I don't know.  I heard him say 2016 I believe.

12  Q.    So it was only done -- the blood work -- the full blood

13  workup was only done in response to his request filing this

14  petition?

15  A.    Correct.

16  Q.    Now, someone with type one diabetes if they have an

17  infection in the toe, it's not unusual they might end up losing

18  the toe, right?

19  A.    Yes, it is unusual.

20  Q.    But it doesn't -- does it happen?

21  A.    Yes, it can happen.  It can happen in non-diabetics also.

22  Q.    Wouldn't you say it was more frequent for diabetic

23  patients to have that than a non-diabetic?

24  A.    Depends on the non-diabetic patient.

25  Q.    And the loss of toe, would be the result of the infection?

31

1  A.    It's the other way around.

2  Q.    Infection causes loss of the toe?

3  A.    Correct.

4  Q.    Infection can be especially a complicated problem with

5  someone with type one diabetes?

6  A.    No.

7  Q.    It's not?

8  A.    No.

9  Q.    You have a patient with type one diabetes, you are not

10 specially concerned about infections?

11 A.    I didn't say that.  That's not what you asked me,

12 counselor.

13 Q.    I think you did, Doctor.  I am going to move on --

14 A.    No, you didn't.

15 Q.    How about -- what do the records reflect about what type

16 of restricted diet Mr. Ferrebee was put on?

17 A.    The first time Mr. Ferrebee came in, June of 2016, he was

18 on an insulin pump.  We removed the insulin pump, and we put

19 him on a diet of 2 grams sodium, low sodium diet with 1,800

20 calories.  It's an 1,880 -- A.D.A. American Diabetic

21 Association diet.

22 Q.    What was explained to him?  Do the records show what was

23 explained to him about the diet?

24 A.    The nurse talked to him, explained to him how to do sick

25 call and explained to him -- well, he knows his diabetes.

1  Q.    What page of the records are you referring to about the

2  nurse's explanation to him?

3  A.    When the -- when the gentleman first came in.

4  Q.    Give us the page, please.

5  A.    It's not in there.  This is the whole medical record.

6  Q.    Let's see.  There's an indication in there that this

7  restricted diet was explained to him?

8  A.    He was told he was on restricted diet.

9  Q.    Is it in the records?

10 A.    Yes.

11 Q.    Can I see it?

12 A.    This is when -- the first time he came in.  He came in

13 again afterwards.  This was -- he came in here a brief time,

14 and he came in over here.

15 Q.    Okay.  Let's start with the first one here.  Would you

16 read the note you're referring to that says how the nurse

17 explained to him the diet?  Read it out loud so the Court can

18 hear?

19 A.    It doesn't say that.

20 Q.    I asked you, is there anything in the record that

21 indicates the nurse explained the diet restrictions to him.

22 A.    The nurse always explains it to them.

23 Q.    Is there anything in the record that shows that?

24 A.    No.  Did she write anything down that she talked to him

25 about it --

33

1    MR. O'BRIEN:  Your Honor, he should answer the

2  question instead of asking himself.  You indicated the record

3  does not indicate the nurse explained that to him.

4    THE WITNESS:  Correct.

5  BY MR. O'BRIEN:

6  Q.    How about the second time -- you talked to him two times.

7  Is it in there either time?

8  A.    On October 15th, he complained to the nurse practitioner

9  I'm not getting a diabetic tray, questions about current

10  insulin regimen, we decreased Lantus insulin and teaching was

11  given.  So we taught him about --

12  Q.    What's the note say?

13  A.    Teaching given.

14  Q.    Teaching about what?  Does it say?

15  A.    Diabetes.  It doesn't say it, no.

16  Q.    Okay?

17  A.    It's a standard practice.

18  Q.    Doctor, who was the person that performed the procedure on

19  Mr. Ferrebee's toes?

20  A.    Which one?

21  Q.    Was there more than one?

22  A.    Yes.

23  Q.    Okay.  Is there a Dr. Tony at the prison?

24  A.    No.

25  Q.    Okay.  Is there anybody --

1 A.   Are you referring to Anthony Ianuzzi, the nurse

2 practitioner?

3 Q.   Nurse practitioner?

4 A.   Yes.  I am not sure what procedure you're talking about,

5 counselor.

6 Q.   Was -- how many procedures performed on his toes?

7 A.   He had the ingrown toenail removed by Tony several times.

8 All the nurses would do procedures, clean it, apply antibiotic

9 ointment and wrap it.  I am not sure what procedure you're

10 talking about.

11 Q.   Do you know how many?

12 A.   It was done twice a day for weeks.

13 Q.   What weeks?

14 A.   From March 4th, 2017 -- pardon me -- from March 3rd, 2017

15 through March -- looks like for ten days, March 3rd, through

16 March 13th, 2017.  And then coming forward, he complained of a

17 problem with his toes again in 2018 -- looks like from February

18 26th, 2018 through March 12th.  On March 13th and 15th he

19 refused treatment of his toe.  And he also refused chronic care

20 clinics.

21      April 16th his left great toe was tender and swollen

22 again.  So we began the process again.  That went from April

23 16th through -- April 16th through May -- April 16th through

24 the 29th.  And then he was seen again on July 21st, 2018 and

25 said it feels better, the redness is gone.

1     He was seen July 28th, July 14th, it looks like August

2     29th -- no pain now -- October 16th, no pain, looks better,

3     September 22nd, October 24th -- pardon me -- October 13th and

4     the 24th, November 10th.  His treatment then by the nursing

5     staff started on the 12th of November and continued for a week

6     through the 19th.  There was to signs of infection.  So it was

7     discontinued.  He was seen again December 8th, and he began

8     treatment that date and that continued until the 13th when it

9     was -- pardon me -- until the 15th when it was discontinued.

10          MR. SEMPA:  Your Honor, if I may, he's expecting a

11    very important medically related call.  And Mr. O'Brien and I

12    agreed that if he got that call, he can take it.

13          THE COURT:  Go ahead.  You can step in that room

14    there.  Can I see counsel at sidebar?

15          (A discussion occurred off the record at sidebar.)

16          THE COURT:  All right.  Having heard the hearing and

17    discussion with counsel for both sides, we have in the matter

18    of the United States versus Josiah Ferrebee, filed to 16

19    criminal 152, we have determined -- I've determined the

20    following:  This is the order that we're entering.  And now

21    this 17th day of December, 2018, it's hereby ordered and

22    decreed that an independent medical examination be conducted on

23    the defendant by a board certified endocrinologist and that the

24    endocrinologist report to the Court his or her findings and

25    recommendations as to the defendant's medical needs.  The

36

1  defendant shall be in the custody of the U. S. marshal who will

2  transport him to and from the medical appointment and return

3  him to the Lackawanna County prison after the medical

4  appointment.

5          The Lackawanna County Prison and U.S. probation

6  office shall provide all relevant medical records to the

7  endocrinologist prior to the examination.  So ordered, okay.

8  Good.

9          MR. SEMPA:  Thank you, Your Honor.

10          THE COURT:  That will conclude this session.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

1          REPORTER'S CERTIFICATE

2

3      I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                          _____
                            Laura Boyanowski, RMR, CRR
15                          Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, PA  18503

20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)

23

24

25